IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KATHRYN SWANTON,           )
                           )
        Plaintiff,         )        NO. 3:20-cv-00480
                           )
v.                         )        JUDGE RICHARDSON
                           )
WYNDHAM   VACATION   RESORTS,  )
INC.,                      )
                           )
        Defendant.         )

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 25, "Motion"), supported by a memorandum of law (Doc. No. 26, "Memorandum in Support"). Plaintiff filed a response (Doc. No. 33, "Response"). Defendant replied (Doc. No. 41, "Reply"). The matter is ripe for review.

For the reasons discussed herein, the Court will deny Defendant's Motion as to Count I (FMLA interference) and grant the Motion as to Count II (Disability Discrimination, Failure to Accommodate, and Failure to Engage in the Interactive Process).

## BACKGROUND[1]

---

[1] Unless otherwise noted, the facts and contentions referred to in this section are taken from Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Additional Disputed Material Facts for Trial (Doc. No. 34) and Defendant's Responses to Plaintiff's Additional Disputed Material Facts for Trial (Doc. No. 42). Facts that are stated herein without qualification are undisputed and treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") are in dispute and are treated as such.

A. <u>Plaintiff's Employment with Defendant</u>

Plaintiff's employment with Defendant began as a timeshare salesperson in August 2013. (Doc. No. 42 at ¶ 1). In summer 2017, Plaintiff was promoted to marketing supervisor, by which she supervised a team of marketing coordinators. (Doc. No. 34 at ¶¶ 2, 4). Plaintiff was responsible for "the performance of her team by monitoring her team's monthly penetration rate – the percentage of owners and guests staying at the Nashville Resort who were persuaded to attend a sales presentation." (*Id*. at ¶ 6).

"On May 1, 2018, [Defendant] coached [Plaintiff] about her management style after several employees complained about her abrupt, disrespectful, and impatient behavior" and disciplined her because "her coaching techniques were found to be inconsistent with company policy." (*Id*. at ¶¶ 13, 14).

On December 7, 2018, Plaintiff was placed on a performance improvement plan ("PIP") because her team was not meeting the required penetration rate of 52.7%. (*Id*. at ¶¶ 15, 16).[2] The PIP provided a list of daily activities and an action plan for Plaintiff to improve her team's performance. (*Id*. at ¶ 17). The PIP also required Plaintiff's team "'to be at budgeted owner pen[etration] rate 52.7% or 40% blended' to end January 2019 or [Plaintiff] would be subject to 'additional corrective action up to and including termination.'" (*Id*. at ¶ 18).

Defendant contends that Plaintiff's team failed to meet the required penetration rate in January, February, March, and April 2019, but Plaintiff disputes this allegation and adds that her team "exceeded the penetration rate in May 2019." (*Id*. at ¶ 19). On April 30, 2019, Defendant

---

[2] Apparently(as noted by Plaintiff in her response to Defendant's statement of undisputed material facts), at this time Defendant "had just increased the penetration rate required for the [m]arketing [d]epartment from 46% as it had been for two or three years prior to 52.7%." Doc. No. 34 at ¶ 16.

disciplined Plaintiff for poor performance and issued her a "letter of expectations" due to her team's continued failure to meet the required penetration rates. (*Id.* at ¶ 23).

B. Plaintiff's Alleged Disability and Defendant's Termination of Plaintiff

Plaintiff contends she suffers from post-traumatic stress disorder ("PTSD") because of a car accident she was involved in with a drunk driver on May 11, 2019. (Doc. No. 42 at ¶¶ 11, 16).

After the car accident, Plaintiff was taken the hospital by ambulance where she remained for a couple of hours. (Doc. No. 34 at ¶ 26). Thereafter, Defendant granted Plaintiff's request to take the remainder off the day off. (*Id.* at ¶ 28). The next day, Plaintiff returned to work and applied for a promotion to marketing manager. (Doc. No. 34 at ¶ 29; Doc. No. 42 at ¶ 13). Plaintiff's supervisor "recommended [Plaintiff] for the promotion, supported her application for the promotion and confirmed that she was in good standing with [Defendant]." (Doc. No. 42 at ¶ 15).

Over the course of the next couple of months, Plaintiff informed her supervisors that "she was struggling to be a leader to her team, that she was having a hard time sleeping, and that she was experiencing panic attacks while driving." (Doc. No. 34 at ¶ 30; Doc. No. 42 at ¶ 16). She also informed her supervisors that working late was negatively affecting her health and requested to transfer to day shift. (Doc. No. 34 at ¶ 31). Plaintiff claims that in response, Defendant's marketing director told her that "there wouldn't be accommodations made" and that she "shouldn't expect any special treatment." (Doc. No. 42 at ¶ 18).

In early June 2019, Plaintiff told one of her supervisors that her condition had not improved and that she needed some time off. (Doc. No. 34 at ¶ 32). That supervisor provided Plaintiff with three days of personal leave, with the option for additional time off if necessary. (*Id.* at ¶ 33). The parties dispute whether Plaintiff requested additional time off other than the three days she was given. (Doc. No. 42 at ¶¶ 17-18).

Defendant claims, though Plaintiff disputes, that Plaintiff never met with her supervisors to discuss her alleged disability and never mentioned PTSD to them. (Doc. No. 34 at ¶¶ 34-36).

Plaintiff informed a program manager that she was "feeling depressed, distraught, and anxious after her car accident." (*Id*. at ¶ 37). However, Defendant contends that Plaintiff did not mention her alleged disability to the program manager. (*Id*. at ¶ 38). Plaintiff also informed Defendant's regional director of marketing that "she was stressed from car shopping and trying to get things settled with insurance, and that she was sore and shaken up" but did not mention a disability or request leave or any accommodation from him. (*Id*. at ¶¶ 39, 40). Plaintiff informed a marketing manager that she was "sore, panicky and anxious after her car accident." (*Id*. at ¶ 41). Defendant contends that the marketing manager assured Plaintiff that "with time she would feel better and the two did not discuss [Plaintiff's] alleged disability or any medical condition." (*Id*. at ¶ 42).

Defendant contends that Plaintiff has not been medically diagnosed with PTSD and has not taken any medication to treat her symptoms post-car accident. (*Id*. at ¶¶ 43, 44). However, Plaintiff started seeing a licensed clinic social worker after her employment with Defendant ended and claims that she has been prescribed and taken medication for PTSD. (*Id*. at ¶¶ 44, 45). Plaintiff stopped meeting with the social worker in 2020 and has not seen a mental health professional since. (*Id*. at ¶ 46).

Plaintiff's team failed to attain a 54% penetration rate in May 2019 as required by the letter of expectations issued to her on April 30, 2019. (*Id*. at ¶ 52). However, Plaintiff contends that in May 2019, the penetration rate was actually 52.7%. (*Id*.). On June 9, 2019, Defendant terminated Plaintiff's employment due to her "continued failure to meet the job performance standards" as a marketing supervisor. (*Id*. at ¶ 53).

C. Defendant's FMLA Leave Policy

Plaintiff never requested a leave of absence from Matrix (Defendant's third-party leave administrator) which is required by Defendant's leave-of-absence policy. (Doc. No. 34 at ¶¶ 47-51). Plaintiff claims that she was unaware of such policy (*Id.*). The relevant portions of Defendant's FMLA policy are as follows:

A. **Family Medical Leave Act**. This LOA policy is intended to comply with all state and federal LOA laws and regulations. In situations where both State and Federal Family Medical Leave Act ("FMLA")[2] laws exist, the policy will be interpreted to comply with the law that offers the highest level of job protection. All absences which meet the FMLA criteria will count towards an associate's FMLA entitlement. Assuming the applicable criteria are met, and unless otherwise stated herein or otherwise required by applicable state law, Wyndham will grant up to a total of twelve (12) weeks for qualified leave purposes per rolling twelve (12) month period, measured by looking back over the preceding twelve (12) months. In the case of a Military Caregiver leave, however, Wyndham will grant up to a total of (26) twenty-six weeks for the twelve month period following the date the leave begins.

Generally, FMLA entitlements are available only to associates who have worked for the Company for at least 12 months and worked at least 1,250 hours in the 12 months immediately preceding the date the leave is to commence[3] (although state law requirements may differ).[4] If an associate requests a leave which does not meet FMLA criteria, the associate may request a personal leave of absence. It is within the discretion of the Company to grant or deny a personal leave and there can be no assurance that a job will be available at the end of such leave and, unless the associate becomes protected during the leave as discussed herein, the associate will be subject to Administrative Termination at the conclusion of such leave. In the event the associate becomes eligible for a protected leave during a non-protected Personal Leave, then the Company will permit the associate to convert the leave to a protected one. In such event, the absences incurred during the Personal Leave will not count toward the FMLA entitlement.

B. **Applying for a Leave.** The associate must request a LOA at least 30 days prior to a foreseeable leave. When the need for leave is not foreseeable, the associate must notify the Company within 1 to 2 business days of learning of the need.

**To Request a Leave of Absence of any kind other than a Personal LOA:[5]**

Advise your supervisor and contact Wyndham's outsourced leave manager, Matrix at 1-877-512-0014 or www.matrixservices.com.

(Doc. No. 25-1). Per the policy, to request a leave of absence Defendant requires employees to notify his or her supervisor *and* contact Matrix. (*Id.*).

Defendant notified Plaintiff about this policy via email on October 2, 2018. (Doc. No. 41-2). The email provides:

| From: | Jones, Tammy |
|---|---|
| To: | Colon, Donna; Swanton, Kathryn; Knutsen, Sonia |
| Cc: | Conner, Carie |
| Subject: | Doctor Notes - Leave of Absence |
| Date: | Tuesday, October 2, 2018 9:57:00 PM |

In discussing associate(s) absences today with Sonia, I wanted to provide the below email for Leave of Absence Process / Doctor Notes.

If an associate misses more than 3 scheduled work shifts he/she must call Matrix at 877-512-0014/ 24 hours-a-day, 7 days a week.

- Once the associate calls Matrix you will receive a notification they have opened a claim and the associate will have need to provide doctor medical certification to Matrix within requested timeframe.
- In the event, the associate missed more than 3 scheduled work shifts, and does not provide a doctor note to Matrix. Matrix will deny the claim and the associate could be subject to WRITTEN Corrective Action for – Unapproved LOA.

If the associate misses less than 3 days from work and provides a doctor's note to return to work, please make sure the associate – only provides you his/her return to work date and no medical history.

- This will limit liability as a manager/supervisor from collecting doctor's note directly from the associate. At times, doctor's note have health records information (HIPPA) attached. HIPAA prohibits employers from accessing medical information, because it could result in discrimination.  *My job as your HR Partner is to protect you ☺  At times we limit information we receive which will limit our risk liability as a manger/supervisor.

As always, I'm happy to assist if you have questions.


**Tammy Jones**
Manager, Human Resources, Nashville and Fairfield Glade

**Wyndham Destinations**
2415 McGavock Pike
Nashville, TN 37214

(*Id.*).

D. <u>Procedural Posture</u>

Plaintiff filed the instant suit on June 9, 2020 alleging violations of the Family and Medical Leave Act ("FMLA") (Count I) and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*. ("ADA") (Count II). (Doc. No. 1 at 4-5). Defendant moved for summary judgment on both counts on April 30, 2021. (Doc. No. 25).

## **LEGAL STANDARD**

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are

improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The Court pauses to make one more observation. Typically, courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

## DISCUSSION

Via the Motion and Memorandum in Support, Defendant moves for summary judgment on all of Plaintiff's claims, arguing that Plaintiff cannot establish FMLA interference, disability discrimination, failure to accommodate, or failure to engage in the interactive process. (Doc. Nos. 25, 26). The Court will discuss each of these arguments in turn.

A. FMLA Interference[3]

The FMLA entitles an eligible employee to twelve workweeks of leave during a twelve-month period for various reasons, such as "a serious health condition," 29 U.S.C. § 2612(a)(1)(D), and "provides a private right of action to employees to protect their rights" by prohibiting employers from "'interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise' FMLA rights" pursuant to 29 U.S.C. § 2615(a)(1). *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010).

To establish a claim for FMLA interference:

> a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016).[4] Alternatively, a plaintiff may establish the fifth element by showing a denial of FMLA *rights* (which may be a concept

---

[3] Although Plaintiff's complaint appears to indicate claims for both FMLA interference and FMLA retaliation (Doc. No. 1 at ¶¶ 25-27), Defendant addresses only a claim for FMLA interference in its Motion, and Plaintiff does not assert a claim for FMLA retaliation in her Response. Accordingly, the Court will not address a claim for FMLA retaliation and instead address *only* a claim for FMLA interference as the parties do.

[4] *Tennial* indicates that these are the elements of a claim of FMLA interference, period, rather than merely the elements of an indirect-evidence *prima facie* case of FMLA interference under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden-shifting framework, which was first developed in the Title VII rather than the FMLA or ADA context, as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a [discrimination] claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

broader than FMLA *benefits*) to which the plaintiff is entitled, such as the right to be reinstated

following the conclusion of FMLA leave. *See Hoge v. Honda of Am. Mfg.¸*Inc., 384 F.3d 238, 244

---

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted). The *McDonnell Douglas* framework, where applicable, thus involves up to three steps, only the first of which is the establishment of a set of elements (of a *prima facie* case).

In other words, *Tennial* suggests that to establish a claim of FMLA interference a plaintiff need show *only* these element and need not also survive the second and third stages of an indirect-evidence framework under *McDonnell Douglas,* because *McDonnell Douglas* is simply inapplicable to such a claim. The Court notes, without dwelling on this, that this suggestion makes perfect sense. On the other hand, the Sixth Circuit has squarely held that *McDonnell Douglas* does indeed apply to a claim of FMLA interference. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2007) (noting that *Grace v. UCAR*, 521 F.3d 655, 670 (6th Cir. 2008), "effectively adopted the *McDonnell Douglas* tripartite test without saying as much" and thus requires the express conclusion that *McDonnell Douglas* applies to claims of FMLA interference). This decision is contrary to the view of other circuits and has been criticized (understandably, in the view of the undersigned) by the majority in a subsequent unreported Sixth Circuit opinion. *See Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 362 n.1 (6th Cir. 2014). Moreover, as *Donald* involved a situation in which the plaintiff had been *terminated* and the defendant sought to offer a legitimate reason, unrelated to the exercise of FMLA rights, for terminating the employee, it may not extend to cases not involving such a situation. *See Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 448 (6th Cir. 2012).

Ultimately, and without delving too much into the considerable nuances here, the Court concludes that *McDonnell Douglas* likely would apply in this case, although arguably that could be different if Plaintiff is proceeding on the denial-of-benefits theory rather than on the denial-of-rights theory. To the extent that *McDonnell Douglas* does apply in this case, that would mean that Plaintiff would not necessarily prevail on a claim of FMLA interference even if she can show all five elements, because Defendant could still prevail at the latter stages of the *McDonnell Douglas* framework. But even if *McDonnell Douglas* would apply here, Defendant cannot prevail at the summary judgment stage without showing that Plaintiff fails to raise a genuine issue as to at least one of the five elements set forth in *Tennial*.

(6th Cir. 2004).[5] Importantly, Plaintiff's complaint seems to indicate that Plaintiff is relying solely on the latter (denial-of-rights) alternative for establishing the fifth element. (Doc. No. 1 at 4). And at times in her briefing, Plaintiff appears to rely on the alleged denial of her right to be reinstated to her position after taking FMLA leave (instead of being terminated). (*See* Doc. No. 33 at 5 (relying on the proposition that if an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA leave, the employer has denied the employee a right to which she is entitled)). But Plaintiff's briefing in response to the Motion at times indicates that Plaintiff is relying on the former (denial-of-benefits) alternative. (*E.g.*, *id.* at 6 ("Plaintiff has also presented proof that Wyndham denied her FMLA benefits to which she was entitled."); (Doc. No. 45 at 2 ("The record contains evidence that plaintiff was qualified for FMLA leave, needed it, requested it and was categorically denied.")). The difference between the two alternatives is not solely academic, for reasons the Court alludes to herein to some extent but on which the Court declines to discuss in detail.

At the summary judgment stage, the initial question as to Plaintiff's claim of FMLA interference is whether Defendant has shown that Plaintiff cannot raise a genuine issue of material facts as to the existence of at least one of the five elements discussed above.[6]

---

[5] On the other hand, the Sixth Circuit has been known essentially to disregard (linguistically, at least) the distinction between these alternatives by equating the denial (via, for example, the defendant's action of terminating the plaintiff) of the right to be reinstated with the denial of an FMLA benefit. *Wysong v. Dow Chem. Co*., 503 F.3d 441, 447 (6th Cir. 2007) ("If an employer takes an employment action based**,** in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."). But the distinction is one that is both intelligible and in certain contexts perhaps one with a difference; for example, the Court notes, without explaining in detail, that the two alternatives may differ from one another as to whether they are subject to the *McDonnell Douglas* indirect-evidence framework for discrimination claims.

[6] As indicated above, *if McDonnell Douglas* did apply to Plaintiff's claims of FMLA interference, then conceivably Defendant could prevail, even without showing that Plaintiff cannot raise a genuine issue of material facts as to the existence of at least one element, if it could show a

Here, Plaintiff claims that "Defendant's termination of [her] deprived [her] of the benefits and rights to which she was entitled pursuant to the FMLA." (Doc. No. 1 at ¶ 25). Defendant moves for summary judgment on this claim arguing solely that Plaintiff "cannot establish a . . . case of FMLA interference because she failed to follow [Defendant's] policy for requesting medical leave which required her to notify her supervisor and contact [Defendant's] third party leave administrator." (Doc. No. 26 at 7).

There appears to be no dispute that Defendant is an "employer" and Plaintiff is an "employee" for FMLA purposes and that Plaintiff was entitled to leave under the Act, thereby satisfying the first three elements of FMLA interference. With the fourth and fifth elements remaining, Defendant fails to mention which FMLA interference element it thinks Plaintiff's failure to notify Matrix wipes out—the fourth element (notice) or fifth element (denial). Accordingly, the Court will make its own determination as to which element Plaintiff's failure to notify Matrix relates to, and the Court finds that it is the fourth element, namely that that employee gave the employer notice of her intention to take leave.

It is well settled that "[t]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (citing *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir.1998)). Here, Defendant contends that Plaintiff "cannot establish a [ ] case of FMLA interference because she

---

legitimate and non-discriminatory reason for its actions and the plaintiff can not show that such reason was pretextual. Here, however, in connection with the FMLA claim in particular, Defendant does not assert a legitimate and non-discriminatory reason for its actions. True, Defendant does assert that Plaintiff's failure to request leave through Matrix is grounds for summary judgment at this juncture. But Defendant has not argued that such failure was, at the time it declined to grant Plaintiff additional FMLA and then terminated Plaintiff, the reason for such declination and such termination. In other words, Defendant has not done anything in an effort to prevail specifically at the second and third stages of *McDonnell Douglas*, and the Court will not undertake that effort for Defendant.

failed to follow Wyndham's policy for requesting medical leave, which required her to notify her supervisor and contact Wyndham's third party leave administrator." (Doc. No. 26 at 7). Defendant argues that its third-party leave administrator requirement is covered under 29 C.F.R. § 825.302(d), which provides:

> (d) Complying with employer policy. An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave. An employee also may be required by an employer's policy to contact a specific individual. Unusual circumstances would include situations such as when an employee is unable to comply with the employer's policy that requests for leave should be made by contacting a specific number because on the day the employee needs to provide notice of his or her need for FMLA leave there is no one to answer the call-in number and the voice mail box is full. Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA–protected leave may be delayed or denied. However, FMLA–protected leave may not be delayed or denied where the employer's policy requires notice to be given sooner than set forth in paragraph (a) of this section and the employee provides timely notice as set forth in paragraph (a) of this section.

29 C.F.R. § 825.302(d). Although it is true that Plaintiff failed to follow Defendant's third party-leave administrator policy in violation of 29 C.F.R. § 825.302(d), there is nothing in that regulation—or in any other regulation, statute, case law cited by Defendant or found by the Court—dictating that if an employee does not follow an employer's usual and customary procedural requirements, then the employee cannot make out case of FMLA interference because the employee cannot possibly be deemed to have provided the "notice" required by the fourth element of an FMLA interference claim. The Court disagrees with Defendant's unsupported characterization of this regulation as absolutely barring an FMLA interference claim for non-complaint plaintiffs. It is one thing to say that something is required; it is quite another to say that

non-compliance with such requirement results in a particular consequence.[7] It is certainly *possible* that one consequence of a plaintiff's non-compliance with an administrative regulation is that it precludes the successful assertion of whatever kind(s) of claim(s) of FMLA interference Plaintiff is asserting. But it is not *self-evident* that this is the case, and Defendant does nothing to evidence (show the Court) that this is indeed the case.

The Court will not read into the regulation that a consequence of an employee violating the regulation is that that employee automatically cannot make out a case of FMLA interference.[8] *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 150, 123 S. Ct. 748, 750, 154 L. Ed. 2d 653 (2003) (citation omitted) ("If a statute does not specify a consequence for noncompliance with statutory timing provisions, federal courts will not ordinarily impose their own coercive sanction."). The regulation does not purport to necessarily make that a particular consequence of non-compliance. As suggested above, the Court is unable to find any regulation, statute, or case standing for the proposition that an employee who fails to comply with 29 C.F.R. § 825.302(d) automatically cannot make out a case of FMLA interference. Such a proposition seems reasonable enough, but it is also a harsh one subject to potential abuse by employers seeking to avoid FMLA liability (or

---

[7] In football, for example, non-compliance with the play clock subjects the team on offense to a consequence. As it happens, there is a rule stating the consequence: a five-yard penalty. The consequence is not that the team on offense loses the game. Here, Defendant has not explained why the consequence for non-compliance with formal notice requirements necessarily is the equivalent of losing the "game" as to the claim of FMLA interference—losing the claim—rather than some less severe consequence.

[8] Although the Court recognizes that the Sixth Circuit has held that employers' rules and policies requiring certain affirmative acts from employees to request FMLA leave do not violate the FMLA, *Keogh v. Concentra Health Servs., Inc.,* 752 F. App'x 316, 322 (6th Cir. 2018), it appears that Defendant (and also Plaintiff) have confused the issues here. The issue is not whether Defendant's policy violates the FMLA (which it clearly does not); the issue is whether Plaintiff can make out a case of FMLA interference based on the specific facts of this case, which is what the Court is analyzing herein.

employees taking FMLA leave to which they are otherwise entitled) by playing a game of gotcha with employees who for whatever reason do not comply with the formal notice requirements. In any event, Defendant has not supported the validity of the proposition on which they rely. Additionally, Defendant has failed to address the possibility that even if the proposition were generally true, it is not true where, as here, Defendant (a) received (through Plaintiff's supervisors) *actual* notice of the request for leave and (b) indeed *granted* Plaintiff's request for *some* FMLA leave despite Plaintiff not having followed the required notice procedure. Indeed, the latter fact suggests that Defendant either (a) waived its notice requirements for Plaintiff; or (b) rendered the regulation inapplicable in Plaintiff's case by revealing that in fact they were not requiring Plaintiff to comply with the employer's usual and customary notice and procedural requirements for requesting leave.

In short, it is conceivable that there is merit to the notion that Plaintiff has failed to establish that she gave "notice" as required for the fourth element of a FMLA interference claim due to non-compliance with 29 C.F.R. § 825.302(d). But there are many reasons to doubt that notion, and Defendant (with its very terse argument on this point) has done nothing to assuage the Court's doubts. Accordingly, Defendant's argument fails to convince the Court that Plaintiff cannot prevail on her claim of FMLA interference. And more specifically, it fails to convince the Court that Plaintiff cannot raise a genuine issue of material facts as to the existence of the fourth element, notice. Absent the argument the Court has rejected, the Court sees nothing to indicate that Plaintiff cannot at least raise a genuine issue as to notice. Indeed, even assuming that the burden had shifted to Plaintiff, as the non-movant, to raise a genuine issue, the Court would find that she has done so.

Although Plaintiff failed to contact the third-party leave administrator, it is undisputed that Plaintiff notified her supervisors that she was requesting leave. (Doc. No. 27 at ¶¶ 32, 47-51). This

notice is sufficient under the FMLA. Indeed, the Sixth Circuit has held that "[an] employee need not expressly assert rights under the FMLA or even mention the FMLA." *Wallace*, 764 F.3d at 586. Plaintiff's giving notice to her supervisors of her request to take leave was enough information to meet her burden on the element of notice. *See Wanner v. Under Armour, Inc.*, No. 3:18-CV-00767, 2020 WL 7489464, at *5 (M.D. Tenn. Dec. 21, 2020) ("The employee's burden is not a heavy one. The sufficiency of notice 'is an intensely factual determination.'") (citations omitted).

Beyond the alleged lack of adequate notice (which, as the Court has noted, relates to the fourth element), Defendant offers no argument for why Plaintiff cannot raise a genuine issue as to FMLA interference. Therefore, Defendant's Motion as to Count I (FMLA interference) will be denied.[9]

---

[9] The final element of FMLA interference is that the plaintiff was denied benefits to which she was entitled. Although Plaintiff claims that she was "deprived" of "benefits . . . to which she was entitled pursuant to the FMLA", Plaintiff has failed to explain what FMLA benefit(s) she was denied.

This is true despite the fact that the Court took the unusual step of providing Plaintiff an additional opportunity to clarify this point. On November 11, 2021. (Doc. No. 44). (The Order was inadvertently titled "MSJ Outline," although it is in fact an order, which is apparent from the document's content.). In the Order, the Court directed Plaintiff to file an explanation of "(i) what FMLA leave she claims she requested and thereafter was denied and (ii) what evidence supports such a claim." (*Id*. at 3). Plaintiff's filed explanation did not address the Court's questions and instead essentially restated the same arguments presented in its previous briefing. (Doc. No. 45, "notice"). The Court was looking essentially for Plaintiff to identify what leave was denied and when and how it had been requested. In her notice, Plaintiff did not do so, and instead left the Court without a clear trail of a particular request for FMLA leave that was *denied* in some sense. For example, Plaintiff could have made clear that, for instance, her theory was: (i) that her June 2019 request for leave amounted to a request for *FMLA* leave and, more specifically, a request for *more than three days* of (FMLA) leave; and (ii) that Defendant effectively denied that request (at least in part) when Plaintiff's supervisor (allegedly) limited her to three days off. But in her notice, Plaintiff provided no clarification along these lines, and instead spoke only in unhelpful generalities of which the Court was already aware.

So even after filing her notice, Plaintiff still has not presented a clear factual theory of a denial of any request for a benefit under the FMLA. (Doc. No. 45). Accordingly, there is reason to believe that perhaps Plaintiff could not meet the fifth element of a claim of FMLA interference.

B. <u>Alleged ADA Violations</u>

Plaintiff's Complaint alleges (in what is styled as a single count of "Violation of the ADA") (1) discrimination based on her disability ("disability discrimination"), (2) failure to accommodate, and (3) failure to engage in the interactive process, all in violation of the ADA. (Doc. No. 1 at 5). Although usually analyzed as subsets of a general disability discrimination claim, the analyses for failure to accommodate and failure to engage in the interactive process are different. Accordingly, the Court will take each of these arguments in turn starting with the general disability discrimination claim. Before doing so, however, the Court must discuss (a) in far more detail than above the purpose and nature of an indirect-evidence claim under *McDonnel Douglas*; (b) the manner in which it functions at the summary judgment, a opposed to trial, stage.

i. *Indirect-Evidence and Direct-Evidence Theories of Liability*

As in various other kinds of employment discrimination cases, in ADA cases, plaintiffs opposing a motion for summary judgment "can support discrimination and retaliation claims using either direct or indirect evidence." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 79 (6th Cir. 2020).

In such discrimination cases, the "[p]laintiffs may carry the burden for summary judgment [if indeed it ever shifts to them] by introducing either direct evidence that shows [the d]efendant was motivated by discriminatory intent in treating [the p]laintiffs adversely, or by introducing

---

However, this alone does not change the Court's conclusion the Defendant has failed to meet its initial burden to show preliminarily that Plaintiff cannot raise a genuine issue as to FMLA interference, which is why the Court will deny Defendant's Motion as to that Count. In particular, the Court declines sua sponte to consider granting summary judgment on this basis, in part because Defendant missed the opportunity to make some hay of its own on this point in its response (Doc. No. 48) to Plaintiff's notice. In particular, Defendant did not seize a potential opportunity, hinted at by the Court, to make a preliminary showing that Plaintiff could not make a sufficient showing of something constituting a denial of what amounted to a request for FMLA benefits; instead, Defendant merely rehashed its argument that "Plaintiff's FMLA interference claim fails because she failed to follow Wyndham's clear and simple directive to notify the Company's third-party administrator in order to request leave." (*Id.* at 1).

indirect evidence that supports an inference of discrimination." *Brewer v. New Era, Inc.*, 564 F.

App'x 834, 838 (6th Cir. 2014).

> a. Indirect evidence (*McDonnell Douglas*)

As noted in a footnote above:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin*, 921 F.3d at 606–07 (citations omitted).

Therefore, if only indirect (and no direct) evidence is present, the plaintiff bears the burden

under *McDonnell Douglas* of first showing its *prima facie* case of race discrimination, *i.e.*, that:

> 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (quoting *Johnson v. Univ. of*

*Cincinnati*, 215 F.3d 561, 572–73 (6th Cir.2000)). If and when the plaintiff establishes a *prima*

*facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory

explanation for its action(s). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

The Supreme Court has prudently cautioned, given the confusion sometimes discernible in

this context, "[t]he nature of the burden that shifts to the defendant should be understood in light

of the plaintiff's ultimate and intermediate burdens." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As the Sixth Circuit recently explained:

> Establishing a prima facie case is not difficult, and it creates a "presumption that the employer unlawfully discriminated against the employee." *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting [*Burdine*, 450 U.S. at 254]). This presumption does not shift the burden of proof, but only the burden of producing some evidence of permissible motive. *See Burdine*, 450 U.S. at 256 n.8, 101 S. Ct. 1089.

*Harris v. City of Akron, Ohio*, 836 F. App'x 415, 419 (6th Cir. 2020).

Thus, as to the existence of legitimate and non-discriminatory reasons for its actions, the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)).[10] To meet that burden of mere production, "the defendant need not persuade the court that it was actually motivated by the proffered reason[s]." *Burdine*, 450 U.S. at 254. Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection[, which] must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will

---

[10] As suggested herein, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times, throughout this burden shifting. *Burdine*, 450 U.S. at 253; *Anthony*, 339 F.3d at 515. The Court keeps this in mind, albeit with the caveat that on the instant Motion it does not sit as the trier of fact but instead concerns itself only with what a reasonable trier of fact could (or could not) find at a hypothetical trial based on the evidence presented on this Motion. Notably, in seeking to meet its burden, the plaintiff cannot rely purely on mere personal belief, conjecture and speculation, because they are insufficient to support an inference of discrimination. *Garren*, 482 F. Supp. 3d at 717.

have a full and fair opportunity to demonstrate pretext.'" *Harris*, 836 F. App'x at 419 (quoting *Burdine*, 450 U.S. at 258).[11]

If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show that the reason offered by the defendant is a pretext. *McDonnell Douglas*, 411 U.S. at 802-04 (1973); *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence[12] each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Tinken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated

---

[11] The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to *articulate* some non-discriminatory reason(s) that *supposedly* motivated the employment decision, and (b) to *provide some evidence* that there was some non-discriminatory reason(s). It is true that some cases use language that seemingly suggests that the burden is the former. *E.g., Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d at 607. But both *Burdine* and *Harris* (which, as noted was relying on *Burdine*) make clear that the employer meets its burden of production only if it presents not merely some statement of what the reason supposedly was, but rather evidence of what the reason actually was.

[12] The "preponderance of the evidence" standard applicable here is the trial standard. At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury *could* make the required finding by a preponderance.

reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003)).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.*, that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful."[13] *EEOC*

---

[13] The required second component seems to coalesce with the required overall showing that the plaintiff must make to meet his or her overall burden of showing unlawful discrimination. Presumably, this is what the Supreme Court had in mind when it stated that the plaintiff's burden as to pretext "merges" with the plaintiff's overarching burden as to the discrimination claim as a whole. *Burdine*, 450 U.S. at 256.

*v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993),[14] and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).[15] In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely

---

[14] One might reasonably ask whether *St. Mary's*, which as noted in *Ford Motor Co.* required the plaintiff to show both components, effectively overruled *Burdine* in one respect. Specifically, this aspect of *St. Mary's* seems in tension with *Burdine*'s statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. The dissent in *St. Mary's* certainly saw the tension. But as far as the undersigned can tell, *Burdine* has never been considered to have been overruled in any respect, and certainly neither the Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's*.

[15] One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

It is worth summarizing in some detail how all of these (variously shifting and conditional) requirements apply in the *summary judgment context* in particular, once the above-referenced principles of summary judgment are applied to the unique framework of indirect-evidence cases under *McDonnell Douglas.* The Sixth Circuit spoke very helpfully on this topic:

> [When a] discrimination plaintiff bases his case on indirect evidence (i.e., evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Rowan*, 360 F.3d at 547; *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir.2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996) (applying the *McDonnell Douglas* framework to a disability-discrimination claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

*Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009).[16]

---

[16] Although *Blair* states that "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination[,]" 505 F.3d at 524, this is actually true only if the defendant-movant met its initial burden of showing the absence of sufficient evidence for a jury to reach such a conclusion. *See Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) ("The moving party must demonstrate the

In the Court's view, what it boils down to, stated as concisely as possible (which, alas, is not particularly concisely), is set forth in the following paragraph.

To obtain summary judgment on a discrimination claim grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing[17] that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can

---

'basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[17] To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.[18]

### b. Direct evidence

As an alternative to indirect evidence, a plaintiff may seek to establish its case via direct evidence. "[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.'" *Id.* "'Whatever the strength of the evidence, it is not "direct" evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir.2005) (quoting *Norbuta v. Loctite Corp.,* 1 Fed. Appx. 305, 313 (6th Cir.2001)). If an inference is required to draw from the evidence the conclusion that an employer was animose against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio 2006).

---

[18] As indicated below, courts' references to a plaintiff's requirement to show "pretext" is actually a requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

"[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 896–97 (6th Cir. 2003). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). "Direct evidence and circumstantial evidence claims run on parallel tracks, and therefore failure to sustain a claim under one framework does not undermine the other." *Erwin*, 79 F. App'x at 899.

Unlike in indirect evidence cases, which as noted always involve the *McDonnell-Douglas* framework, "[i]n direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Norbuta v. Loctite Corp.*, 1 F. App'x 305, 311–12 (6th Cir. 2001) ("If a plaintiff produces credible direct evidence of discrimination, discriminatory animus may be at least part of an employer's motive, and in the absence of [rebuttal evidence sufficient to remove any genuine issue (doubt) that the employer would have terminated the plaintiff even absent a discriminatory motive], there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court."); *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) ("In contrast to purely circumstantial cases of retaliation, an employee

who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."). "In particular, the burden of persuasion stays with the plaintiff throughout the *McDonnell Douglas* analysis; in contrast, the defendant in a direct evidence case has the burden to show that its stated reason for acting against the plaintiff was not pretextual." *Erwin*, 79 F. App'x at 899. In the summary judgment (as opposed to trial) context, the defendant-movant's burden is to remove all doubt about pretext, *i.e.*, remove any genuine issue of material fact as to whether it would have terminated the plaintiff even had it not been motivated (in part) by discriminatory animus.

      ii.    *Plaintiff's Disability Discrimination Claim*

Plaintiff claims that Defendant "terminated [her] employment because of her disability and/or perceived disability[,] in violation of the ADA." (Doc. No. 1 at 5). Defendant contends that Plaintiff's disability discrimination claim fails because she is not disabled and its decision to terminate her had nothing to do with her alleged disability. (Doc. No. 25 at 1).

The Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Amendments Act ("ADAAA"),[19] prohibits employers from discriminating against a qualified individual on the basis of disability. 42 U.S.C. § 12112. To the extent that it is based on indirect evidence, a claim of disability discrimination is analyzed under the *McDonnell Douglas*

_____

[19] The ADAAA was enacted (effective January 1, 2009) to make amendments to the Americans with Disabilities Act (ADA) to, among other things, ensure "a broad scope of protection to be available under the ADA." *See Taylor v. Specialty Rest. Corp.*, No. 2:12-cv-44, 2014 WL 4922942, at *4 (S.D. Ohio Sept. 30, 2014) (quoting ADAAA).

burden-shifting framework discussed above. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).

To establish an indirect-evidence *prima facie* case of disability discrimination, a plaintiff must show:

> [1] she was disabled;[20] [2] she was otherwise qualified to perform the essential functions of her job; [3] she suffered an adverse employment action; [4] her employer knew or had reason to know of her disability; and [5] either the position remained open or a non-disabled person replaced her.

*Id.* Additionally, "[t]he ADA bars discrimination 'because of' an employee's disability, meaning that it prohibits discrimination that is a 'but for' cause of the employer's adverse decision." *White v. Hoeganaes Corp.*, No. 3-12-0783, 2013 WL 5346277, at *3 (M.D. Tenn. Sept. 23, 2013) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012)).

In assessing whether Plaintiff survives summary judgment on an indirect-evidence theory of disability discrimination, the Court begins by assessing whether Defendant can show that Plaintiff lacks sufficient evidence as to one or more of the five elements of an indirect-evidence *prima facie* case. As indicated below, in this case the element at issue is the first one, *i.e.*, Plaintiff having a disability. After changes to the ADA made by the ADAAA, having a "disability" means (A) having a physical or mental impairment that substantially limits one or more major life activities; (B) having a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). The definition of disability "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A); *Saenz v. LRC Rest. Nashville, LLC,* No. 3:18-cv-01401, 2020 WL 758814, at *3 (M.D. Tenn. Feb. 14, 2020). In her complaint, Plaintiff relies on the first and third, but not the second, of these.

---

[20] It is apparent that here the Sixth Circuit meant "had a disability" rather than the statutorily imprecise and arguably (depending on the context) insensitive term, "was disabled."

The determination of whether a person has a "disability" under the first definition (actual disability) involves three steps: (1) deciding whether the plaintiff suffers from a physical or mental impairment; (2) deciding what major life activity the plaintiff claims is limited by that impairment and whether that activity constitutes a "major life activity" under the ADA; and (3) deciding whether the identified impairment substantially limits that life activity. *See Garcia v. NYC Health & Hosps. Corp.*, 19 Civ. 997 (PAE), 2019 WL 6878729, at *10 (S.D. N.Y. Dec. 17, 2019) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998))." *Whitesell v. FMS Fin. Mgmt. Servs., LLC*, No. 3:18-CV-00496, 2020 WL 2770017, at *4 (M.D. Tenn. May 28, 2020). Defendant points to numerous parts of Plaintiff's deposition tending to suggest that Plaintiff would be unable to establish (a) that she actually suffered from the impairment that she alleges in her complaint to have, namely, PTSD; and (b) that the alleged PTSD substantially limited a major life activity. (Doc. No. 26 at 10-11).[21]

Defendant also challenges Plaintiff's ability to establish the third definition of having a disability. Defendant's challenge here is a bit thin, inasmuch as Defendant relies more on conclusory assertions that Plaintiff was not regarded as having anything (including PTSD) that would rise to the level of a disability, and less on citations to evidence tending to show that Plaintiff lacks evidence to establish that she was regarded as having a disability; these are two different tasks, and Defendant should have focused more on the latter task, which is what Rule 56 (and *Celotex* and its progeny) requires. However, Defendant does point to deposition testimony of Plaintiff suggesting that what she did tell Defendant's managers would not have been sufficient to

---

[21] Plaintiff alleges having PTSD in paragraph 11 of her complaint. (Doc. No. 1 at 2). In the same paragraph, she also mentions neck and ankle injuries, but in her Response she does not assert that such injuries constitute a disability, and instead asserts only that her alleged PTSD constitutes a disability.

convey to them that she had an impairment amounting to a disability, (Doc. No. 26 at 12),[22] which in turn suggests that she lacks evidence of Defendant's managers having received information that would have caused them to regard Plaintiff as having a disability.

Thus, Defendant has shifted the burden to Plaintiff to raise a triable issue as to whether she had a disability under one of the three alternative definitions.[23] In Plaintiff's case, it would have to be under the first or the third definitions, because Plaintiff does not rely on the second definition of having a disability. That is, she does not claim, either in her complaint or in her Response, that she had a record of an impairment that would rise to the level of a disability;

In response, Plaintiff first argues based on her alleged PTSD that she has a disability under the first definition (actual disability). (Doc. No. 33 at 9-10). She claims in her Response that she "suffers from post-traumatic stress disorder as a result of her May 11, 2019 car wreck, which affected her ability to work, drive at night and sleep, and which caused her to suffer anxiety and panic attacks."[24] (*Id*. at 10). But other than this wholly conclusory assertion that she has PTSD,

---

[22] Defendant cites to page 61 of Plaintiff's deposition transcript (Doc. No. 26 at 12), where Plaintiff is asked whether she told anyone with Defendant that she had a disability. After answering in the affirmative, she describes what she told two persons with Defendant (Charm Smith and Kaylie Riddick), and her description tends to suggest that what she told them would have conveyed that certain of her life activities (such as sleeping) were being limited, but not that she had PTSD or anything amounting to a physical and mental "impairment"; if anything, her description suggests that such limitations were the result of general stress—a significant but quite common feature of the human condition—and not anything constituting a physical or mental "impairment," let alone a clinically-diagnosed impairment.

[23] Despite considerable looking, the Court can find no authority indicating that Defendant must show preliminarily than *none* of the three alternative definitions has been met, and the Court believes that it is fair to put the non-movant (Plaintiff) to its proof based upon Defendant meeting its initial burden of preliminarily showing the lack of evidence to support what is certainly the *primary* definition of having a "disability."

[24] Notably, although extant literature consistently describes PTSD as a mental impairment, Plaintiff claims that she "suffered from a physical impairment" in her Complaint. (Doc. No. 1 at ¶ 33). Nevertheless it seems clear that Plaintiff's alleged disability is PTSD, and the Court will

she mentions PTSD only one other time in her Response. There she did nothing more than cite to a single page in the transcript of her deposition, where she testified that she told her supervisors that she was "struggling to be the leader that the team needed at work. That [she] was having a hard time sleeping. [She] was having panic attacks in the car. [] [W]orking late was negatively affecting [her] health. And [she] requested to initially move to day shifts." (Doc. No. 25-1 at 12).[25] Even though Plaintiff makes such assertions, she provides no evidence of a clinical diagnosis of PTSD.[26] Plaintiff's testimony, alone, is not enough to meet her burden of showing sufficient evidence that she has the alleged impairment (PTSD) as required to meet the actual disability definition.

Her testimony is likewise insufficient to meet her showing that the alleged impairment substantially limited one or more life activities. This case is much like *Evola v. City of Franklin, Tenn.*, 18 F.Supp.3d 935 (M.D. Tenn. 2014), where the court found (among other things) that the plaintiff failed to show that her impairment caused such a limitation. The court explained,

> [The] [p]laintiff's proof of her disability includes depositions of current or former City of Franklin employees, none of whom is a medical professional. (Docket Entry Nos. 41, 42). The Defendant, however submitted medical proof that Plaintiff suffers from PTSD. (Docket Entry No. 30). Yet, Plaintiff's proof does not address whether the [p]laintiff's PTSD impairs or limits one or more of her major life activities . . . . Although [the] [p]laintiff's complaint alleges that her PTSD

_____

proceed accordingly. Perhaps Plaintiff's view is that PTSD is associated with physical as well as mental symptoms and is in that sense a "physical impairment." In any event, the Court treats PTSD as a cognizable impairment; the Court deems it at least primarily a mental rather than a physical impairment, but the Court's stance in this regard actually is immaterial to the resolution of the Motion.

[25] Page 12 of Docket No. 25-1 consists of page 61 of the transcript of Plaintiff's deposition, and the quoted testimony is from lines 1 through 12 of that page.

[26] It is true that on page 56 of her deposition (Doc. No. 25-1 at 10), Plaintiff testified that her "therapist" diagnosed her with PTSD. But Plaintiff does not rely on, or even cite, such testimony, and even if she had, her claim that her "therapist" provided such a diagnosis would count for very little, inasmuch as the claim is extremely cursory, with no context whatsoever provided for this "diagnosis" or the qualifications of the "therapist" who provided it.

"significantly affects her sleep, energy levels, ability to work, ability to concentrate, and ability to engage in social interactions," (Docket Entry No. 1, ¶ 11), [the] [p]laintiff lacks any proof for these allegations. Thus, the Court concludes that [the] [p]laintiff's proof on her ADA claim cannot support a judgment on that claim.

*Evola*, 18 F. Supp. 3d at 945. Similarly, Plaintiff here claims—relying solely on the sparse testimony quoted above—that her PTSD caused her anxiety, trouble sleeping, and panic attacks. (Doc. No. 25-1 at 61:1-12). However, Plaintiff does not provide testimony of anyone besides herself stating as much. She provides the Court with no technical or medical evidence to the effect that her alleged PTSD impairs or limits one or more of her major life activities. Even if she did have sufficient evidence that she had PTSD, she has failed to show adequately that it caused a substantial limitation of any particular alleged life activities; even if she did endure such limitations, that would not necessarily mean that any such limitation was caused by her PTSD, and Plaintiff cannot reach a jury on that issue just based on her own (layperson) say-so.

In short, Plaintiff here has relied on a just small snippets of her own lay testimony to the effect that she suffers from PTSD. This may count for something, but not very much. And to survive summary judgment on an ADA claim, "a plaintiff must produce more than a scintilla of evidence to survive summary judgment, and Plaintiff has not done so here." *Saenz*, 2020 WL 758814, at *6. Therefore, Plaintiff's claim of disability under the first definition (actual disability) fails.

Plaintiff also argues that she has a disability under the third definition.[27] That is, she claims that Defendant "regarded her" as having a mental or physical impairment. (Doc. No. 33 at 10).

An individual will qualify as "regarded as" having a disability if the individual "establishes that he or she has been subjected to an action prohibited

---

[27] Plaintiff does not rely on the second definition of having a disability, *i.e.*, having a record of something that would constitute a disability, *i.e.*, a record of a mental or physical impairment that substantially limits one or more life activities.

under [the ADA] because of an actual or perceived physical or mental impairment, *whether or not the perceived impairment limits or is perceived to limit a major life activity.*" 42 U.S.C. § 12102(3)(A) (emphasis added). The statute, as amended in 2008 under the so-called ADAAA, clarifies that an individual making a "regarded as" claim need not show that an employer perceived an impairment that is substantially limiting as to a major life activity. *Equal Emp. Opportunity Comm'n v. M.G.H. Family Health Center*, 230 F. Supp. 3d 796, 806 (W.D. Mich. 2017); Thus, the 2008 amendments codified in the ADAAA made the ADA's definition of being 'regarded as' having an impairment substantially broader than that definition had been. Under 42 U.S.C. § 12102(3)(A), implemented by the 2008 amendments, a plaintiff can qualify as having a "disability" by virtue of being regarded as having an impairment less severe than an actual disability; i.e., regarded as having an impairment even if the perceived impairment is not regarded as limiting one or more major life activities.

*Stinson v. Nissan N. Am., Inc.*, No. 3:18-CV-0145, 2019 WL 6174841, at *5 (M.D. Tenn. Nov. 20,

Plaintiff has not met her burden here, because she has not shown sufficient evidence that Defendant regarded her as having her alleged impairment (PTSD), let alone that such perception led to her being subjected to an adverse action by Defendant. For the proposition that she was "regarded as" having a disability, Plaintiff cites only certain pages of her own testimony (namely, pages 61-64, 67-68, and 123-24), which she represents contain testimony regarding her "reported the effects of her post-traumatic stress disorder (loss of sleep, panic attacks, difficulty driving) to her supervisor, Charm Smith." (Doc. No. 33 at 10). There are multiple problems with her approach here. The first is that most of the cited pages from her deposition are simply not in the record, and so the Court cannot rely on them; the scant few pages that are in the record provide sparse information about what was said to Plaintiff's supervisor and what her supervisor would have gleaned from those conversations. Second, even accepting (as the Court does for present purposes) that Plaintiff reported some things that constitute effects of PTSD (albeit not effects that are exclusive to PTSD), that does not mean that Defendant *believed* her reports of having the effects of PTSD; Plaintiff should have provided evidence suggesting that Defendant in act did believe her to the extent that it would perceive of her of having such effects. And third, even if Defendant

perceived her as suffering from *certain symptoms that happen to be effects of PTSD* (as well as other impairments), that does not mean that Defendant perceived of her as suffering *from PTSD*. Plaintiff has provided no evidence in the record to show that Defendant, from the cited conversations or otherwise, would have perceived her as having *PTSD* (rather than more routine, and less clinical, issues with stress). Accordingly, Plaintiff has not provided evidence from which a jury could reasonably conclude that Defendant regarded Plaintiff as having a disability.

Because Plaintiff has failed to establish that she is disabled under the first definition (actual disability) or third definition (regarded as) and asserts no record of such disability to meet the second definition, Plaintiff cannot succeed on her disability discrimination claim under an indirect-evidence theory.

As seems apparent from the above discussion, but nevertheless must be noted explicitly, Plaintiff does not claim to have direct evidence of disability discrimination as defined above. Thus, this alternative theory is foreclosed as well.

Accordingly, Defendant's Motion as to Plaintiff's disability discrimination claim will be granted.

i.  *Failure to Accommodate*

In her complaint, apart from claiming that she was discriminated against based on her alleged disability, Plaintiff also claims that Defendant failed to accommodate her disability. (Doc. No. 1 at ¶ 36). Plaintiff has since fleshed out her failure-to-accommodate theory, claiming that Defendant did not "reasonably accommodate her requests for time off (other than for three days) or a shift reassignment to day shift to alleviate the night driving that was causing her anxiety and panic attacks." (Doc. No. 33 at 9).

Failure-to-accommodate claims do not involve the *McDonnel Douglas* burden-shifting approach for claims based on indirect evidence. Instead, "ADA failure to accommodate claims are analyzed pursuant to the direct test." *Fisher v. Nissan N. Am., Inc*., 951 F.3d 409, 417 (6th Cir. 2020). As for why this is the case, and as to what is meant by the "direct test," or "direct evidence" in this particular context, the Sixth Circuit explained in the seminal case of *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862 (6th Cir. 2007):

> [F]ailing to make a reasonable accommodation falls within the ADA's definition of "discrimination." Accordingly, claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination. *Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1283 (7th Cir.1996). This conclusion is consistent with the definition of direct evidence, for if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination. *See Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999) (sex-discrimination case; defining direct evidence as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions"); *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003) (race-discrimination case; noting that direct evidence does not require the fact-finder to draw any inferences to conclude that the defendant discriminated against the plaintiff). It is further consistent with our analysis in *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1182–84 (6th Cir.1996), in which we noted that claims for failure-to-accommodate fall within the category of cases in which the employer relies on the employee's disability in its decision-making, and consequently are suitable for analysis under the direct-evidence framework. *See also Hoskins v. Oakland County Sheriff's Dep't,* 227 F.3d 719, 724–30 (6th Cir.2000) (applying direct-evidence standard to claim for failure to accommodate).
>
> When an ADA plaintiff premises his claim upon direct evidence, we jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases (also called "circumstantial-evidence cases"), and we analyze the claim under the following framework:
>
> > (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and

> therefore a business necessity, or that a proposed accommodation
> will impose an undue hardship upon the employer.

*Id. at* 868–69 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). The

Court pauses to note what is implicit in the above discussion: in the specific context of a failure-

to-accommodate claim, "direct evidence" does not mean what it means in the context of a general

discrimination claim, *i.e.,* "evidence which, if believed, requires the conclusion that unlawful

discrimination was at least a motivating factor" in the challenged employment decision. *Bartlik*,

73 F.3d at 103 n.5 (internal quotation marks omitted). It could not possibly mean that, because a

failure-to-accommodate claim is not about discriminatory animus and does not require a plaintiff

to show discriminatory motive, so such a claim is not concerned with evidence showing a

discriminatory motive.[28] It is clear that in this context direct evidence is, instead, evidence that

---

[28] This is clear from *Kleiber*'s identification of the proper analysis of a failure-to-accommodate
claim, no part of which has anything to do with whether the defendant-employer had
discriminatory intent—intent to discriminate against an employee based on disability status. It is
also clear from the extant case law. An excellent discussion is provided by one Tenth Circuit
opinion in particular:

> Because the [ADA] only prohibits discrimination "on the basis of
> disability," [for a claim under ADA] there must be a nexus between the disability
> and [an] adverse employment action. In other words, it is not enough that an adverse
> employment action is suffered by an individual with a disability; rather, the disabled
> individual must show that the adverse action was "on the basis of" the disability. In
> most types of ADA cases, this is done by proving the employer acted with
> discriminatory intent. Such discriminatory intent can be shown either through direct
> evidence—that is, "evidence, which if believed, proves the existence of a fact in
> issue without inference or presumption"—or through circumstantial evidence,
> which is evaluated under the *McDonnell Douglas* burden-shifting framework to
> determine whether a reasonable factfinder could infer that the employer's
> motivation was discriminatory and that any proffered nondiscriminatory business
> reason for the decision was merely pretextual. *Shorter v. ICG Holdings, Inc.*, 188
> F.3d 1204, 1207–08 (10th Cir. 1999).

> There is at least one type of ADA claim, however, which does not require
> any evidence of discriminatory intent, whether direct or circumstantial: a failure-
> to-accommodate claim. Under the ADA, "the term 'discriminate against a qualified

individual on the basis of disability' includes ... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). "Unlike other enumerated constructions of 'discriminate,' this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'—the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is exigible." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999). That is to say, the only reason an accommodation is required is because of the disability, and thus the failure to provide a reasonable accommodation to a qualified employee with a disability is inherently "on the basis of [the] disability," 42 U.S.C. § 12112(a), regardless of the employer's motivation. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 n.12 (10th Cir. 1999) (en banc) ("In [a failure-to-accommodate] case, the Congress has already determined that a failure to offer a reasonable accommodation to an otherwise qualified disabled employee is unlawful discrimination," so we do not need "to probe the subjective intent of the employer."). The employer must of course know of the employee's disability and of the accommodation the employee wishes to receive in order to have any responsibility for providing such an accommodation. *See id.* at 1171–72. But, assuming the employee has provided notice to the employer of her disability, any limitations which result therefrom, and the accommodation she wishes to receive, then the employer's failure to provide a reasonable accommodation for the disability establishes the required nexus between the disability and the alleged discrimination without the need to delve into the employer's subjective motivations. Thus, the employee need present no evidence, whether direct or circumstantial, of discriminatory intent in order to succeed on a failure-to-accommodate claim.

*Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017). Or as the Fourth Circuit put it:

> *McDonnell-Douglas* burden-shifting approach was irrelevant to the legal claim [the plaintiff] brought. Her failure-to-accommodate claim requires no evidence of discriminatory intent. So *McDonnell-Douglas*—addressing legitimate business reasons and pretext to infer discriminatory intent—does not apply here. The failure to provide a "reasonable accommodation" that would not impose an "undue hardship" is itself the discriminatory act prohibited by the ADA.

*Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021).

goes towards (the above-stated elements from *Kleiber*—elements (1) and (2)(a), (b) or (c)—that a plaintiff (lacking the alternative of indirect-evidence theory) must show (in addition to the third and fourth elements mentioned below) to prevail on the claim.[29]

It bears emphasis that *Keliber* is properly seen as prescribing in its first two steps elements of a *prima facie* case that the plaintiff must show—one element in each of the first two steps—with the plaintiff being afforded three different alternatives for establishing the second element. *See Fisher*, 951 F.3d at 417 (explaining that to make out a case of failure-to-accommodate sufficient to place the burden on the defendant, a plaintiff must show "(1) that [s]he is disabled, and (2) that [s]he is 'otherwise qualified' for the position despite [ ] her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." (citing *Kleiber*, 485 F.3d at 869). And although *Kleiber* did not happen to mention this in its description of the proper analysis, the

---

[29] Evidence that goes towards these elements is evidence that, at least under a broad view of the notion of "discrimination," fits a slightly different definition of "direct evidence," namely, evidence that "does not require a factfinder to draw any inferences to conclude that the employer wrongfully discriminated." *Brown*, 814 F. App'x at 79.

The ADA deems failure to accommodate a kind of "discrimination." *See Fisher*, 951 F.3d at 416 ("failure to accommodate is listed in the Act's definition of disability discrimination" (citing 42 U.S.C. § 12112(b)(5)(A)). This may be something of a mischaracterization because failure to accommodate does not require discriminatory intent, and the gist of failure to accommodate is that the defendant did not do something it should have done—*i.e.,* it violated a duty owed to the plaintiff—and thus is liable irrespective of why it violated that duty and whether it had any discriminator animus towards persons (like the plaintiff) with a disability. But although it is probably a misnomer to call failure to accommodate a form of discrimination, the ADA does just that (under a very broad view of "discrimination"). So under the ADA, an employer "wrongfully discriminates" if it fails to accommodate the plaintiff's disability. So evidence that the defendant failed to accommodate the plaintiff's disability is evidence that the employer wrongfully discriminated. Evidence that satisfies the elements stated in *Kleiber* (and the other two elements) is therefore evidence that the defendant "wrongfully discriminated." And it is evidence that does not require any inferences (of discriminatory intent) to be drawn to conclude that the elements are satisfied and that the employer therefore presumptively discriminated against the plaintiff. And so evidence those goes towards these four elements is appropriately considered "direct evidence" under *Brown*'s definition of "direct evidence."

plaintiff must additionally show what are essentially a third element and a fourth element: that he or she "requested an accommodation," and that "the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011) (citation omitted). And step three of *Kleiber*, which may or may not ever be reached in the analysis, prescribes two alternative defenses, each of which serves as an absolute shield to liability if the defendant can establish it. To be clear, the alternative defenses are (i) that a challenged job criterion is essential, and therefore a business necessity, and (ii) that a proposed accommodation will impose an undue hardship upon the defendant.[30]

Defendant argues that Plaintiff's failure to accommodate claim fails because: (1) she did not have disability, as required by the first element, and (2) even if she did have a disability, she did not advise Defendant of her alleged disability or request an accommodation beyond the one Defendant provided to her, as required by what is effectively the third element. (Doc. No. 25 at 1) The Court resolves this claim in Defendant's favor based on its first argument, and thus it does not reach the second argument.

As suggested above, a plaintiff cannot make out a failure-to-accommodate claim without proving that she had a disability. And so on motion for summary judgment, a failure-to-accommodate claim cannot survive unless the plaintiff shows sufficient evidence to raise a genuine dispute as to the existence of a disability. Here, as discussed above, Plaintiff has not shown sufficient evidence for a jury to find that she had a disability. Accordingly, the Court's inquiry ends here and Defendant's Motion as to Plaintiff's failure to accommodate claim will be granted.

---

[30] If this is the case, it perhaps could be said that the defendant had a legitimate and non-discriminatory reason for its actions, but neither of the alternative defenses is properly characterized in terms of the defendant having a legitimate, nondiscriminatory rationale for its failure to accommodate. Each of the alternative defenses is more specific than that.

Finally, Plaintiff claims that Defendant "failed and refused to engage in the interactive process required by the ADA." (Doc. No. 1 at ¶ 36). Such a claim can support a theory of liability under the ADA, separate from the general disability-discrimination and failure-to accommodate theories:

> "Failure to engage in the interactive process can constitute an independent violation of the ADA. *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014). Under the ADA, when an employee proposes a reasonable accommodation, the employer has a duty to engage in an interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84-85 (6th Cir. 2012) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)). Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008) (citing *Kleiber*, 485 F.3d at 871). However, "[a]lthough mandatory, failure to engage in the interactive process is only an independent violation of the ADA *if* the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation." *Rorrer*, 743 F.3d at 1041 (citing *Keith v. County of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013)). In addition, [w]hen a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility. *Kleiber*, 485 F.3d at 871 (internal quotation marks and citation omitted)."

*Weems v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:17-CV-01072, 2018 WL 6341826, at *7 (M.D. Tenn. Dec. 4, 2018).

Defendant argues that this claim fails because it in fact did engage in the interactive process. It points to evidence (namely, pages 64-65 of Plaintiff's own testimony) showing that Defendant did engage in an interactive process at least to the extent that Plaintiff's supervisor (Ms. Smith) heard Plaintiff out, granted her three days off due to her reporting that her condition was still poor, and stated that she would talk about the possibility of more time off once Plaintiff returned from her three days off. (Doc. No. 26 at 15-16 (citing testimony at Doc. No. 25-1 at 13-

14). This sufficed to shift the burden to Plaintiff to raise a genuine dispute that Defendant actually had not engaged in an interactive process. Plaintiff has failed to meet her resulting burden. Once again, she provides a string cite to pages of her deposition that include some found nowhere in the record. (Doc. No. 33 at 15 (citing 61-64, 67-68, 114, and 123-24 of Plaintiff's deposition transcript)). As for the cited transcript pages that are in the record (pages 61, 64, and 68), they by no means suggest that Defendant did not engage in the interactive process or that at some point stopped so engaging. At most, those pages show that the interactive process was not leading to the results (the accommodation(s)) Plaintiff wanted; this conceivably could have sufficed to show (assuming that Plaintiff had not failed in showing that she had a disability and that such disability entitled her by law to the results she wanted) failure to accommodate, but it does not suffice to show *failure to engage in the interactive process.* Accordingly, Defendant's Motion will be granted as to Plaintiff's claim for failure to engage in the interactive process.

## CONCLUSION

For the reasons discuss herein, the Court will grant in part and deny in part Defendant's Motion. Specifically, it will deny the Motion as to Count I (FMLA Interference) and grant the Motion as to Count II (Disability Discrimination, Failure to Accommodate, and Failure to Engage in the Interactive Process).

An appropriate order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE